NELLIE McKINLEY MOORE, appellee, was replaced by H. W. MARKS, administrator of her estate, and GENEVIEVE M. VINCE, her sole heir-at-law, as substituted appellees, v. JAMES L. McKINLEY et al., appellants.

No. 48580.

(Reported in 69 N.W.2d 73)

736

March 8, 1955.

E. E. Poston, of Corydon, H. E. Long, of Leon, Lundy, Butler & Lundy and Donald C. Wilson, all of Eldora, for appellants.

Garrett & Bown, of Corydon, for appellee.

Bliss, J.—After the submission of this appeal, plaintiff-appellee died intestate on November 14, 1954, leaving as her only heir-at-law, Genevieve M. Vince. H. W. Marks was ap-

pointed administrator of the decedent's estate on January 6, 1955. With the consent of all parties the said administrator and Genevieve M. Vince were substituted as appellees herein by order of this court on January 13, 1955.

The evidence in this action was presented on September 29 and October 2, 1952, to the Honorable George A. Johnston, Judge of the District Court, and, after full submission on written briefs and arguments, the cause was taken under advisement by the court, but before findings and final decree could be prepared, Judge Johnston died on December 6, 1952. Thereafter, on the order of the Chief Justice of this court, said cause, on the full record presented to Judge Johnston, was submitted for determination and decree to the Honorable Heinrich C. Taylor, Judge of the Second Judicial District of Iowa.

The pleadings, with attached exhibits, cover seventy pages of the printed record. A summary of their allegations and prayers is unnecessary. The controversy principally involves the construction of certain wills and a quitclaim deed. James W. Porter, a resident of Wayne County, Iowa, at the age of seventy-five years, executed his last will on May 6, 1910. He died May 23, 1921, and his last will was probated June 6, 1921.

The provisions of the will, principally involved in this litigation, are the following, in substance:

"Par. 13. I give, devise, and bequeath to my daughter, Clara V. McKinley, for and during her natural life, meaning hereby to create, and convey to her an estate during her natural life, the following described real property, viz:" ($E\frac{1}{2}$ $SW\frac{1}{4}$ and $SW\frac{1}{4}$ $SE\frac{1}{4}$ and all of $SE\frac{1}{4}$ lying west of the right of way of the C. B. & Q. Railroad, all in Section 3, Township 70 North, Range 23, except about three acres previously conveyed for cemetery purposes, and containing altogether about 142 acres; and the $S\frac{1}{2}$ $NW\frac{1}{4}$ and $NE\frac{1}{4}$ $SE\frac{1}{4}$ of Section 33, and the $W\frac{1}{2}$ $NE\frac{1}{4}$ of Section 26, all in the same township and range above noted, in Wayne County, Iowa.)

"Par. 14. At the death of the said Clara V. McKinley, I bequeath in fee, the said land in Section three (3), described in paragraph 13 of this will, to her son, James W. McKinley; and

the S½ NW¼ and the NE¼ SE¼ of Section thirty-three (33), and the W½ NE¼ of Section twenty-six (26) to her son, Leo G. McKinley.

"Par. 15. If the said James W. McKinley, shall have died before the said Clara V. McKinley, leaving children surviving him, the land bequeathed to him shall be divided equally between them, share and share alike; but if the said James W. McKinley shall have died before the said Clara V. McKinley, leaving no children surviving him, the said land shall go to his brother, Leo G. McKinley, but if the said Leo G. McKinley shall have died before the said James W. McKinley, without leaving issue, the said land shall be divided equally between the other children of the said Clara V. McKinley."

Paragraph 16 of the will is identical with paragraph 15 if the names James W. McKinley and Leo G. McKinley be transposed wherever they appear in paragraph 16. The testator executed two codicils to his will and each confirms it, except as to changes therein, not pertinent in this suit. The only property involved in this litigation is the land in Section 3—the 142 acres legally described in paragraph 13 of the will, set out above. At the time of the testator's death, his grandson, James W. McKinley and family were living in Texas. Clara V. McKinley did not personally take possession of the land devised to her in paragraph 13 of the will, but she furnished money to her son James W. to pay his obligations in Texas, and to transport him and his family from Texas to Wayne County and place them on the farm, bought him an automobile and equipment and livestock to enable him to operate the farm. James went on the farm in June 1921 and operated it for nine years. The rental arrangement between him and his mother was that he was to pay her annual rent of $1.50 an acre, and also pay the taxes. He became involved financially and she signed his promissory notes to the amount of $4000. When he asked more financial aid from her she told him there had to be an end to it, and that she could not continue paying 8% interest, and he should negotiate a mortgage on the 142 acres at a lower rate of interest. He did so. When she was called to the bank to sign the mortgage papers she found the loan was for $5000 instead of $4000, but she executed the papers, and

when she later asked him why he had added the $1000, he told her he had to have the extra money.

This note for $5000 and the mortgage on the 142 acres were executed on September 1, 1925, by Clara V. McKinley and James W. McKinley and his wife, Lydia E. McKinley. The payee of the note and the mortgagee was the Bankers Life Company. James W. McKinley received and used the money borrowed. James W. McKinley was unable to pay the mortgage indebtedness when it was due. Clara V. McKinley was notified that the mortgage would be foreclosed if not paid at maturity. On August 1, 1930, James W. McKinley and wife, Lydia, for a recited consideration of "One Dollar and other valuable consideration", executed to Clara V. McKinley, a quitclaim deed to the 142 acres in controversy, a life estate in which had been devised to the grantee in the James W. Porter will. The deed was filed for record on August 2, 1930.

On September 5, 1930, Clara V. McKinley purchased the $5000 note and mortgage and they were assigned to her, without recourse, by the Bankers Life Company. The assignment was filed for record on May 25, 1932. In a letter of August 29, 1947, written by Clara V. McKinley to her grandson James L. McKinley (one of the defendants) in Los Angeles, California, she referred to this mortgage. In a reply letter of September 22, 1947, to Grandmother McKinley, James L. McKinley stated: "It was with the greatest surprise and amazement that I noted your comments with reference to a mortgage. I assume this to be the same one that Will Moore spoke to me about some time ago, I believe in 1938 or 1939. At the time * * * I advised him that it was my feeling that the above referred to mortgage had no legal standing and that it had been entered into illegally by both you and father. I quite naturally had this matter checked most carefully both by my own firm of attorneys here in Los Angeles and by a leading attorney in Des Moines. Both without the least question advised me that any mortgage entered by either you or father against any part of the land had absolutely no legal standing or recognition. Therefore, I dismissed the matter of any mortgage against the land completely from my mind and will continue to do so. * * *."

"Granma McKinley", as she signed the letter, on October 2, 1947, wrote to "Dear James" stating: "Your letter received a few days ago, and I really was surprised at your attitude, altho, perhaps I shouldn't have been after the reception I received the last time I saw you. * * * I had not heard anything from either of you for *so long*. I knew nothing of what you were doing. * * * I have never had any of your addresses so how could *I* write?

"And so you are consulting *'fine Lawyers'* to learn how you can beat your Old Granmother out of what is justly hers, Eh? Well James do you think I am a fool or a skinflint? I was on your father's notes at the bank for Four Thousand Dollars, and was keeping the interest paid, all the time, and the tax on the farm part of the time. * * *." Referring to her purchase of the Bankers Life mortgage, she stated in this letter: "I *borrowed* the money to buy it and pay the accumulated interest. I borrowed $3000 from the Humeston bank, and $2000 from the Corydon bank, and neither one asked me for any collateral in any form. Could you or any one of my father's family or yours do that? I paid that money at the banks in about three years, by applying all my income from all sources * * *. I have explained this in a brief way so you will know I consulted lawyers as well as you, but from a very different purpose. *Yours* to *beat* me, & *mine* to *save* you. * * *." (The italics are by the writer of the letter.)

The quitclaim deed was received in evidence subject to defendants' objection, among others, that "no consideration was paid therefor." The deed recites "valuable consideration" other than the "One Dollar." In addition to the mortgage obligation taken up by Clara V. McKinley, checks of hers payable to James W. McKinley, endorsed by him and stamped paid, unpaid promissory notes of his payable to her, other evidences of indebtedness of James W. McKinley owing to her, including money furnished for the schooling of defendant, James L. McKinley, at Drake University, with handwriting and signatures all identified and undenied, were found in the safe-deposit bank box of Clara V. McKinley, by her guardians on their appointment. The quitclaim deed was executed at about the maturity of the mortgage

debt, and when foreclosure was threatened. The indebtedness of James W. McKinley to his mother, not including the mortgage debt was in excess of $11,000. A substantial part of it was shown by evidence introduced by defendants.

The matter of lack of consideration for the quitclaim deed is not raised in this court.

Just when Leo G. McKinley, the other son of Clara V. McKinley mentioned in the Porter will, died does not appear in the record, but he was deceased at the time of the trial, and apparently left no children. The only witnesses for appellee were Nellie McKinley Moore and H. W. Marks. Those testifying for appellants were Fred Gunzenhauser and Lydia E. (Fry) McKinley. The testimony of the latter consisted principally in identifying some exhibits, and in giving the ages of her sons, James L. as 45, Hubert as 42 and Robert as 33. She was the only defendant who testified.

James W. McKinley died intestate September 26, 1930, survived by his widow and three sons, all defendants herein.

Fred Gunzenhauser moved on the farm in 1929 and remained thereon as a tenant of Clara V. McKinley for twenty-three years, until March 1, 1952. He was a witness for defendants. Reference to his testimony will hereinafter be made.

On March 18, 1943, Clara V. McKinley made her will. In the first three paragraphs she provided for the payment of last expenses, and for some specific bequests. In paragraph four, subject to the preceding paragraphs, she bequeathed and devised all of the property of which she died seized, of every kind, to her daughter, Nellie McKinley Moore, the plaintiff herein, without limitation. The fifth paragraph is as follows: "In making this will I have in mind that my three grandsons have been well provided for by my father and that they are not in need of any help from me since they, at my death, will get the land in which I have a life estate, so in any and all events I will them no part of my estate." She appointed her daughter, the plaintiff, as executrix.

On June 28, 1950, a codicil to this will was executed, which provided: "In paragraph Fifth of my Will I made reference to the fact that my three grandsons will get certain land in

which I have a life estate. I should have said in my Will that said grandsons take said land subject to a mortgage on said land and I now make that correction, said mortgage being for the principal sum of $5000.00. Said mortgage was given to Bankers Life Company and was purchased of said company by me and it was assigned to me. Said land is subject to and liable for said mortgage, together with interest thereon." A second codicil was made August 17, 1950, but it affected only some personal property, and bequeathed to "my granddaughter, Genevieve M. Vince, my four-drawer walnut chest of drawers."

Plaintiff testified that, although her mother, Clara V. McKinley, was not mentally incompetent, she was not capable of looking after her property because of old-age and physical disabilities, and for that reason, on August 11, 1950, she filed a petition, so alleging, for the appointment of a guardian of her mother's property, and her mother gave written consent to the appointment of H. W. Marks as guardian of her person and property. The witness testified that her mother was mentally competent at all times. Mr. Marks qualified as guardian, and the files in the guardianship were received in evidence, subject to plaintiff's objection as to their competency, relevancy and materiality.

Clara V. McKinley died testate March 14, 1952, and her guardian, Mr. Marks, and the plaintiff qualified respectively as executor and executrix of her estate.

The questions presented to this court for determination are the same as those presented to the trial court. They were and are: 1. Was the devise to James W. McKinley in paragraph 14 of the will of James W. Porter an indefeasible vested fee simple estate in remainder in the land in Section 3, described in said paragraph, subject only to the particular estate devised to Clara V. McKinley? 2. Did the quitclaim deed, of James W. McKinley and wife, of said land to Clara V. McKinley convey to her said vested fee simple estate in remainder therein? 3. Did the title and ownership of said land and a fee simple estate therein, without limitation, pass to the plaintiff under the will of Clara V. McKinley? 4. Were the counterclaims of defendants barred by

sections 614.1(6) and 614.17 of the 1950 and 1954 Codes of Iowa?

The trial court, by its Opinion, Findings of Fact, Conclusions of Law, and Decree, answered the first three questions in the affirmative, and quieted title to the land in the plaintiff, as its absolute and unqualified owner in fee simple, as against any claim of any right, title or interest of any nature or kind in and to said real estate by defendants, or any one claiming by, through or under them. It found it unnecessary to answer the fourth question, which had been raised by plaintiff's pleadings.

I. The propositions relied upon by appellants for reversal are first, the title to the farm is vested in defendants James L., Hubert G. and Robert A. McKinley and should be quieted in them; second, their counterclaims are not barred by the statute of limitations relied on by plaintiff. Elaborating on the first proposition they urge that the title should be quieted in defendants because:

"1.1. The remainder of James W. McKinley was contingent and lapsed when he failed to survive the life tenant, Clara V. McKinley, and title vested in. defendants.

"1.2. Such remainder being contingent the interest of Clara V. McKinley under the quitclaim deed lapsed on the death of James W. McKinley, and she took no interest in the farm thereby.

"1.3. Plaintiff took no title to the farm under Clara V. McKinley's will because:

"1.3a. Clara V. McKinley had only a life estate which terminated at her death.

"1.3b. The terms of her will expressly exclude any devise of the farm.

"All conflicting interests being dependent upon James W. McKinley surviving the life tenant, Clara V. McKinley must by necessity fail upon his predeceasing the life tenant."

Appellants' brief and argument consists of 136 pages, and that of appellees, 77 pages. They exhaustively argue the law and the facts and we shall not attempt to discuss all of the ramifications. The pertinent principles of law are well known to the bench and the bar. There is no controversy between the parties over them. They simply reach conflicting conclusions in their

application to the facts. And the chief, and really only controversial facts, are the respective testamentary intentions of James W. Porter and of Clara V. McKinley.

We will first discuss the Porter will. The determining factor there is whether James W. McKinley, the grandson of the testator, was devised a contingent remainder, or a vested remainder, in the 142 acres.

A remainder in land was defined by Coke to be "a remnant of an estate in lands or tenements, expectant on a particular estate", created together with the same at one time. 33 Am. Jur., Life Estates, Remainders, Etc., section 46, page 508; 31 C. J. S., Estates, section 68, page 88.

"The term 'remainder' is relative and implies a prior disposition of some part of the estate, but the particular estate and the remainder constitute one whole, are carved out of the same inheritance, and may both vest at the same time and subsist together." 33 Am. Jur., section 47, page 509. See also Tiedeman on Real Property, Second Ed., section 396, page 387.

"Remainders are divided into two classes, *vested* and *contingent*. A vested remainder is a present vested right to the future enjoyment of the land. In a vested remainder only the possession is postponed. It is, therefore, a *vested* and *executory* estate. * * *." (Footnote) " 'The present capacity of taking effect in possession, if the possession were to become vacant, * * * distinguishes a vested remainder from one that is contingent.' " Tiedeman, supra, section 397, page 389. See also 31 C. J. S., Estates, section 69, page 90.

"A remainder is vested when it is limited to an ascertained person or persons with no further condition imposed upon the taking effect in possession than the determination of the precedent estate." 33 Am. Jur., Life Estates, Remainders, Etc., section 66, page 525.

"A remainderman whose interest is vested does not have actual or constructive possession of the property, but simply an estate to vest in possession in the future. The right of the estate is fixed and certain, although the right of possession is deferred to some future period. A vested remainder confers a present fixed right to the future enjoyment * * *. It is as truly a present

fixed property or ownership as is an estate in possession. The person entitled to the remainder has an immediate fixed right of future enjoyment, that is, an estate in praesenti, notwithstanding it can only take effect in, possession and pernancy of the profits at a future period. Where a devise of real property is made to one from and after the termination of an intermediate estate, the fact that the devisee is not to have the enjoyment of possession until the termination of the intermediate estate does not prevent the vesting of the remainder immediately upon the death of the testator, for the remainder is vested if it is certain to take effect in possession by enduring longer than the precedent estate." 33 Am. Jur., Life Estates, Remainders, Etc., section 67, pages 527, 528.

, "No uncertainty of enjoyment will render the remainder contingent. The contingent or vested character of the remainder is only determined by the uncertainty, which attends the vesting of the right to the estate. * * *. Not only will the mere uncertainty of enjoyment not make the remainder contingent, but the remainder will be a good vested one, although it may be absolutely impossible for the remainderman ever to enjoy the possession of it. Thus a grant to A. for one thousand years, remainder to B. for life; B. is sure to die before the natural expiration of A.'s estate, but the remainder, nevertheless, is good, although it ends with B.'s death. *And if the remainder to B. were in fee, although he would not be able to enjoy it, he could convey it to others or devise it, and if he died without making a disposition of it, it would descend to his heirs.*" Tiedeman on Real Property, supra, section 401, pages 397, 398. (Italics ours.)

In Fulton v. Fulton, 179 Iowa 948, 957, 162 N.W. 253, 256, L. R. A. 1918E 1080, the court said:

"The common-law definition of remainders may be stated briefly as follows:

" 'Remainders are either vested or contingent. A vested remainder, whereby the estate passes by the, conveyance, but the possession and enjoyment are postponed until the particular estate is determined, is where the estate is invariably fixed to remain to certain determinate persons. Contingent remainders

are where the estate in remainder is limited to take effect either to a dubious or uncertain person or upon a dubious or uncertain event, so that the particular estate may be determined and the remainder never take effect.' * * * [page 961] In this state [Iowa], the common-law rule presumptively prevails."

We have never departed from these definitions. Katz Investment Co. v. Lynch, 242 Iowa 640, 650, 47 N.W.2d 800; In re Estate of Organ, 240 Iowa 797, 801, 38 N.W.2d 100; Sick v. Rock, 240 Iowa 584, 588, 37 N.W.2d 305; Skelton v. Cross, 222 Iowa 262, 265, 266, 268 N.W. 499, 109 A. L. R. 129; Henkel v. Auchstetter, 240 Iowa 1367, 1378, 1384, 39 N.W.2d 650; In re Estate of Wright, 241 Iowa 349, 354, 41 N.W.2d 80; In re Estate of Phearman, 211 Iowa 1137, 1144, 232 N.W. 826, 82 A. L. R. 674; Williamson v. Youngs, 200 Iowa 672, 203 N.W. 28, 30; Dickerson v. Morse, 200 Iowa 115–117, 202 N.W. 601.

"An estate in fee simple is the greatest estate and most extensive interest which a person can possess in landed property, being an absolute estate in perpetuity. It embraces all the estates that may be carved therefrom, and there can be but one estate in fee simple to a particular described tract of land. * * * A title in fee or fee simple is a full and absolute estate, beyond and outside of which there is no other interest or right; a title to the whole of the thing absolutely; it is an indefeasible title or estate, in which is blended the right of possession and the right of property." 31 C. J. S., Estates, section 8b(1), pages 18, 19.

"[It is] an estate of inheritance without condition, belonging to the owner, and alienable by him or transmissible to his heirs absolutely and simply; an estate or interest in land of one holding absolute and exclusive control and dominion over it, no matter how acquired. 'Fee simple' and 'fee' are generally used as convertible terms, and it has been held that the several terms 'fee', 'fee simple', and 'fee simple absolute' are substantially synonymous, and that an absolute estate is a fee simple." 31 C. J. S., Estates, section 8, page 18. See also 19 Am. Jur., Estates, section 14, page 472.

"When the term 'in fee', without adjunct, is used as applied to estates, it is to be taken as descriptive of the highest and most enlarged estate, as contradistinguished from a fee conditional at

the common law or a fee tail by the Statute de Donis." 19 Am. Jur., Estates, section 12, page 471.

"A fee simple is a freehold estate of inheritance free from conditions and of indefinite duration. It is the highest estate known to the law, and is absolute, so far as it is possible for one to possess an absolute right of property in lands. The word *fee* without any qualifying adjective implies an unlimited estate of inheritance. Such is also the case with the term 'fee simple absolute.' The three terms 'fee', 'fee simple', and 'fee simple absolute', may be used interchangeably; the adjectives in the last two are surplusage, and are generally used for the purpose of distinguishing that class of estates from those which are called base or qualified fees." Tiedeman on Real Property, section 36, page 27.

In Johnson v. Board of Supervisors, 237 Iowa 1103, 1106, 1107, 24 N.W.2d 449, 452, the court said: "A 'fee simple' estate is one by which the owner holds lands to himself and his heirs forever, without mentioning what heirs, but referring that to his own pleasure or to the disposition of the law. The estate may be either legal or equitable, since the term 'fee simple' is not used to distinguish between legal and equitable estates but is used to denote the quantity or duration of estates, whether the enjoyment is limited or unlimited in duration. 31 C. J. S. 18, 19, section 8; 19 Am. Jur. 472, 473, section 14. At common law the term 'fee simple' was used in contradistinction to such terms as 'fee tail', 'life estate', or 'term for years.' 19 Am. Jur. 470, 471, section 12. We have no reason to doubt that the legislature here used the term 'fee simple' in much the same sense. The substance of the classic definition, of 'title' is: the means whereby the owner has the just possession of his property. * * * But 'title' is frequently used to mean ownership. 41 Words and Phrases, Perm. Ed., 673, 674. See also Scofield v. Moore, 31 Iowa 241, 245."

II. The testator when he made his will, and at his death, had the title to, and the unqualified ownership of, the 142 acres in controversy. In other words he held and owned the land in fee. He had the entire estate therein—the absolute right to the property and to its possession. By his will he carved out of that estate the right to the possession and use of said land during

the life of his daughter, Clara, and devised it to her. And subject to her life tenancy, he devised the absolute and unqualified title to, and ownership of, the land which was his at his death—the estate in fee therein—to Clara's son James W. McKinley by this direction in paragraph 14 of his will, to wit: "At the death of the said Clara V. McKinley, I bequeath in fee, the said land in Section three (3), described in paragraph 13 of this will, to her son, James W. McKinley; * * * ." This devise to James W. McKinley was absolute and without qualification, limitation or condition, stated in said paragraph. It was the devise of the remainder in said land subject only to the particular estate devised to Clara. By these two devises, both effective and vesting at the instant of his death, the testator parted with his entire interest and estate in said land, as stated above, which was the greatest interest and estate in land known to the law. No interest therein remained for other or further disposition. The remainder of the language in paragraph 14 was devoted to the devise of the land in Sections 26 and 33 to Clara's son Leo G. McKinley. The devise to James W. McKinley was the remainder of the fee or fee simple estate in the land owned by the testator at his death, subject only to the life estate. This remainder vested in James W. McKinley at the testator's death, subject to no other condition, qualification or limitation.

III. Whether a testamentary remainder is vested or contingent must be determined by the intent of the testator as expressed by the language of the will, if it is plain and unambiguous, and nothing else, considering the will as a whole, and giving effect to every provision thereof if it is reasonably possible. This has been the holding of the court in so many opinions that extensive citation thereof is unnecessary. Wright v. Copeland, 241 Iowa 447, 452, 41 N.W.2d 102; Lytle v. Guilliams, 241 Iowa 523, 525, 526, 41 N.W.2d 668, 16 A. L. R.2d 1377; In re Estate of McCulloch, 243 Iowa 449, 457, 458, 461, 52 N.W.2d 67; Watkins v. Dean, 243 Iowa 599, 602, 52 N.W.2d 498; In re Estate of Fintel, 239 Iowa 475, 479, 480, 31 N.W.2d 892.

IV. All parties concede this cardinal rule, but defendants urge that giving it full force it is apparent it was the intent

of the testator to give but a contingent remainder to James W. McKinley. While canons of testamentary construction serve no purpose when the intent of the testator clearly appears in the will, they are useful as an aid in determining that intent when there is uncertainty or ambiguity present. The parties disagree as to the significance of the words, which we have italicized, *"At the death of the said Clara V. McKinley,* I bequeath in fee, the said land in Section three (3) * * * to her son, James W. McKinley", in paragraph 14 of the will. Defendants contend they refer to the time of the vesting of the devise in the son at that time, while plaintiffs insist they mean the time when he would come into possession and use of the land. We agree with the latter contention. We have many times held, in accord with the general rule elsewhere, that such words and other words of like meaning refer not to the time of the vesting of the right to the estate devised, but to the time when the devisee comes into its enjoyment.

One of our later opinions stating this rule is Katz Investment Co. v. Lynch, 242 Iowa 640, 652, 47 N.W.2d 800, 807, supra, to wit: "That subparagraph f provides 'Upon the death of all of my said children * * * the property shall revert and descend to the legal heirs of my said children' does not indicate an intent to postpone vesting of the remainders until such time. Such language is usually held to refer to the time of enjoyment and possession by the remaindermen, not to the time of vesting. Sick v. Rock, 240 Iowa 584, 588, 37 N.W.2d 305, 307, and citations; Lingo v. Smith, 174 Iowa 461, 468, 156 N.W. 402, and citations; 33 Am. Jur., Life Estates, Remainders, etc., sections 108, 109. See also Birdsall v. Birdsall, supra, 157 Iowa 363, 365, 132 N.W. 809, 36 L. R. A., N. S., 1121." The opinion also cites in support of our holdings, Restatement, Property, section 157, comment h, and comment j.

See also Blair v. Kenaston, 223 Iowa 620, 625, 626, 273 N.W. 184; Schrader v. Schrader, 158 Iowa 85, 88, 139 N.W. 160; In re Estate of Phearman, 211 Iowa 1137, 1145, 232 N.W. 826, 82 A. L. R. 674; Moore v. Dick, 208 Iowa 693, 696, 225 N.W. 845; Archer v. Jacobs, 125 Iowa 467, 480, 101 N.W. 195. We find

nothing in the record herein justifying a departure from this long-established rule.

V. Defendants also urge that paragraph 15 of the will clearly indicates the intent of the testator to devise the land involved to the children of James W. McKinley surviving him at his death prior to the death of Clara. We agree with the position of plaintiffs and the holding of the trial court on this point. As hereinbefore stated, the testator in a preceding paragraph of his will had, without qualification, condition or contingency, devised the vested remainder interest and estate in this land to James W. McKinley, thus depriving himself of the power or capacity to make any other or further disposition of it in his will inconsistent with that devise. The devise relied upon by defendants in paragraph 15 of the will being in conflict with, and repugnant to, said devise to James W. McKinley, was void and of no force and effect. We so hold, in accord with the well-established rule of testamentary construction, and decisions of this court.

See Canaday v. Baysinger, 170 Iowa 414, 419, 152 N.W. 562, 564, where we stated: "The rule which has been adopted in the construction of wills is that the first taker to whom the testator has given the estate in fee, with full power of alienation, must be considered the absolute owner, as against any later provision of the will which would destroy or nullify the first. The limitation over is held void for repugnancy."

In Todd v. Stewart, 199 Iowa 821, 825, 202 N.W. 844, 845, we said: "But, as has frequently been said, there are some things that even a testator cannot do. It is settled by an unbroken line of decisions that, where a will gives an absolute title in fee, any attempt in a subsequent clause to defeat, destroy, or limit the title or estate so given, is held to be inconsistent with the disposition so made, and does not affect it. The two provisions are, in their nature and under the law, repugnant; and the subsequent attempted limitation upon what has once been expressly given, must fail. Alden v. Johnson, 63 Iowa 124; Bills v. Bills, 80 Iowa 269; Talbot v. Snodgrass, 124 Iowa 681; Luckey v. McCray, 125 Iowa 691; Ogle v. Burmister, 146 Iowa 33; Canaday v. Baysinger, 170 Iowa 414; Bellamy v. Bellamy, 184 Iowa 1193."

It is stated in In re Estate of Bigham, 227 Iowa 1023, 1026,

290 N.W. 11, 12: "Appellant concedes the well-established rule that a testator cannot make an absolute devise of his property in fee and in a subsequent clause destroy or place a limitation on such title, the subsequent limitation being void for repugnancy."

See also In re Estate of Edwards, 231 Iowa 71, 79, 300 N.W. 673; Bradford v. Martin, 199 Iowa 250, 253, 201 N.W. 574; In re Estate of McCulloch, 243 Iowa 449, 459, 52 N.W.2d 67; Iowa City State Bank v. Pritchard, 199 Iowa 676, 678, 202 N.W. 512.

VI. Another proposition urged by defendants is this: "Paragraphs 14 and 15 of the Porter will did not devise the indefeasible fee simple absolute title to the farm and vest such title in James W. McKinley immediately upon the death of Porter as this is an impossibility under the law when applied to the facts in this case. It was manifestly impossible for James W. McKinley to receive a fee simple title at the death of testator until the preceding life estate had been terminated."

After quoting a number of definitions of the term "fee simple", one of them being that of Robert W. Swenson in his article on Possessory Estates and Future Interests in Iowa, in 36 I. C. A., page 77, to wit: "Practically, the fee simple is the equivalent of absolute ownership", defendants again state: "When the foregoing definitions of a fee simple are applied to paragraphs 13, 14 and 15 of the Porter will, it is apparent that with the life estate to Clara V. McKinley outstanding, it was utterly impossible for a fee simple title to vest in James W. McKinley at the death of the testator."

We find no merit whatsoever in this proposition. There is no conflict between the two devises. Both vested in the respective devisees at the same time at the instant of the testator's death. Neither had any priority over the other with respect to the time of the vesting of the two devises. All that Clara received was the right to possess the land for a specified period. Subject to this tenancy, James was given the absolute right and title to the remainder interest, the possession of which was held in abeyance until the life estate terminated, at which time the two estates would be merged in the remainderman. The holder of the fee can burden it with a lease or a tenancy for years or for the life of a person, and he can receive the land in fee subject to such

burdens. The owner of land, so long as he violates no rule of law or public policy, may devise it as he pleases, and by such tenures as he may desire. It is common practice for a testator to devise land to his widow for her life with remainder in fee to his children, making both devises effective at his death.

As said in 33 Am. Jur., Life Estates, Remainders, Etc., section 47, page 508: "The essence of a remainder is that it is to arise immediately on the determination of the particular estate * * *. Thus a devise to A for twenty years, *remainder to B in fee, is the most simple illustration of a particular estate and a remainder.*" (Italics ours.)

In Callison v. Morris, 123 Iowa 297, 301, 98 N.W. 780, 782, quoting 2 Underhill, section 860: " 'The simplest example of a vested remainder is a devise to A for his life, and after or at his death the fee to go to B and his heirs, and A and B are both living at the death of the testator.' "

Other cases in which vested remainders "in fee simple" were subject to a life estate are Moore v. Dick, 208 Iowa 693, 694, 225 N.W. 845; Dickerson v. Morse, 200 Iowa 115, 116, 118, 202 N.W. 601.

In a dissent in In re Estate of Gordon, 213 Iowa 6, 12, 236 N.W. 37, 40, by Judge Evans, is this language: "This was a typical case of remainder vested in real estate. The will gave a life estate to the wife and a remainder *in fee* to the son, subject however to a trust for a period of six years in favor of the son. A vested remainder to the son was created in terms. We held that the creation of the trust did not prevent a vesting of the remainder." (Italics ours.)

VII. Defendants assert as matters for consideration in the determination of this appeal what they term "practical constructions" of the Porter will by interested parties, particularly by Clara V. McKinley. The tenant on the land during most of the life tenancy of Clara, testifying for defendants, said that during the last six or eight years he was on the farm she told him she had but a life estate in the land and that she did not care to spend much money on improvements as her three grandsons would get the land at her death. This is not denied and could not be as she was dead.

But there were letters of hers, in the later years of her life, introduced in which she made like statements. Similar statements were made in the codicil to her will. The statements were thus conclusively established.

But there were other acts and conduct on her part which may be "practically construed" as indicating that she thought and believed that James W. McKinley was the absolute owner of the land. When she refused to sign any more notes for him she told him to negotiate a mortgage on the land, which he did. His doing so was a "practical construction" that *he* thought he had a vested remainder. The Bankers Life Company no doubt insisted that she, as life tenant, sign the mortgage papers. She probably thought the land would be good for the debt, and must have thought that he had a vested remainder and was the real debtor. The mortgagee must have had the same thought, as it accepted the title. The mortgage recited that the mortgagors "hereby warrant the title against all persons whomsoever."

In exhibits in Clara's handwriting made prior to receiving the quitclaim deed in August 1930, she referred to the farm on which she held the $5000 mortgage as the "Jim McKinley farm." She stated that when land for the cemetery was sold out of the farm for $500, Jim received and kept the money. When she gave checks prior to the receipt of the deed, for taxes on the farm or for interest on the mortgage, she noted thereon "for Jim's taxes" or "Jim's interest on farm mortgage", or "taxes on mine and Jim's land." When she bought the Bankers Life mortgage and gave her check on August 30, 1930, for $3000 to the Corydon State Bank for a draft to the Bankers Life Company she wrote on her check "for Jim's Mtge."

When she redeemed the $5000 mortgage and took an assignment of it she recorded it. She also recorded the quitclaim deed to the farm which James W. McKinley gave her at about the same time. Both instruments were found in her safe-deposit box in the bank after her death.

She recited in the codicil to her will that she held the mortgage which was a lien on the land and must be paid by whoever received it. This conduct on her part is convincing evidence that she thought the deed and mortgage were valid instruments executed by James W. McKinley as owner of the land.

Defendants also assert that Nellie McKinley Moore in her petition for the appointment of a guardian of the property of Clara alleged that the latter had but a life estate in the land, and the fact that Nellie Moore and H. W. Marks as such guardians inventoried and reported her interest as but a life estate, and that as executrix and executor of Clara's estate they so referred to her interest in the files of the estate, were all "practical constructions" favorable to defendants. The answer to this is that the quitclaim deed was not found until after the files in said estates were prepared.

These "practical constructions" do not aid defendants. Any such acts or conduct on the part of Clara or others indicative of their conclusions or opinions respecting the testamentary intent as shown by his will do not affect or alter that intent.

■■■ VIII. Defendants contend that the quitclaim deed does not purport to sell or convey, but only to quitclaim the property. They concede, however, that it passed all right, title and interest which the grantors had in the land at the time they executed the deed. The statute so provided at the time the deed was executed, and there has been no change in it. Sections 10042 and 10051, Code of 1927, and corresponding sections in all subsequent Codes. No contrary intent can be reasonably inferred from the terms of the deed. The grantor owed the grantee many thousands of dollars at the time the deed was executed. The grantor had a vested remainder in fee in the land when he delivered the deed to Clara V. McKinley. She acquired such title, interest and estate thereby, and since she had a life estate therein, she became the absolute owner of the land in its entirety, which she retained until her death. The grantor's wife, defendant Lydia E. McKinley, joined in the deed. There is no merit to the defendants' contention that nothing was conveyed by the deed.

IX. One of defendants' propositions for reversal is that the plaintiff was not devised this land by the will of her mother, Clara. The fourth paragraph of the will, which is in fact the residuary clause thereof, and was preceded only by some minor bequests of personalty, is as follows: "Subject to the above provisions I hereby will, devise and bequeath unto my beloved daughter, Nellie Jane Moore, *all of the property of which I shall*

*die seized and possessed, of every kind and character and wherever situated, the same to be hers without limitation."* (Italics ours.) The fifth paragraph of the will and the first codicil have been set out herein. In these the testatrix had mentioned that she was giving her grandsons nothing as they would get certain land in which she had a life estate. In addition to the 142 acres involved in this suit, she had a life estate in 200 acres of other land devised to her son Leo in her father's will. Leo died and there was nothing in the record to indicate he left any children. The inferences are to the contrary.

Defendants argue that the fifth paragraph of, and the codicil to, her will, indicate that Clara had no intention of devising the 142 acres to her daughter, Nellie.

 Of residuary gifts, it is stated in 57 Am. Jur., Wills, section 1415, pages 946, 947: "The residue of an estate may be defined as that which remains after discharging all legal and testamentary claims of the estate or, in other words, that which is left after the payment of charges, debts, and particular legacies. The benefaction conferred ·by the residuary clause of a will is only that which remains after all paramount claims upon the estate of the testator are satisfied. Debts and legacies having been provided for, however, the operation of a general residuary clause to include, in the absence of any contrary testatorial intention, all species of property owned by the testator at the time of his death and otherwise undisposed of by the will, *whether or not the owner was aware of such ownership, is recognized in many decisions.* * * * Many of the problems of construction involving general residuary gifts also arise in connection with particular residuary·gifts, and it is to be noted that use of the phrase 'residuary gift' or 'residuary clause' in the ensuing discussion is not necessarily to be confined to general residuary benefactions."

Idem, section 1416, pages 947, 948: "While the traditional words of a residuary gift are, of course, the 'rest, residue and remainder of my estate', or some close variant thereof, it is recognized that no particular language is necessary ·to create a residuary gift; and although a 'residuary' clause, in a strict sense, would seem to presuppose prior particular bequests or devises, effect analogous to that accorded genuine residuary clauses is frequently given gifts embracing 'all' of the testator's property,

the 'balance' of the testator's estate, etc. In particular instances, however, the contention that a will contained a residuary clause or appointed a residuary donee has been denied."

See footnotes on these pages, of various residuary clauses, among which are: "Koontz v. Hubley, 19 Ohio App. 484 (affirmed in 111 Ohio St. 414, 145 N.E. 590) citing R. C. L. ('all the property both real and personal of every kind and description wheresoever situated which I own at the time of my decease not heretofore devised')." A like statement from Anderson v. Gift, 156 Miss. 736, 126 So. 656, is noted.

In Nichols v. Swickard, 211 Iowa 957, 959, 234 N.W. 846, 847, we said: "The general, ordinary, and usual signification of the term 'residuary estate' is what remains after satisfaction of the debts, expenses of administration, legacies, and devises has been made. The purpose of such clause is to make a complete testamentary disposition of the testator's estate, so that no part of it may be left to pass as intestate property."

In In re Estate of Austin, 236 Iowa 945, 948, 20 N.W.2d 445, 447, 162 A. L. R. 709, 713, we said: "There are certain widely recognized rules of construction which have some application here. A will should be so construed, if fairly possible, as to avoid even partial intestacy. Kalbach v. Clark, 133 Iowa 215, 222, 110 N.W. 599, 12 L. R. A., N. S., 801, 12 Ann. Cas. 647; Creel v. Hammans, 234 Iowa 532, 534, 13 N.W.2d 305, 307; Myers v. Smith, 235 Iowa 385, 393, 16 N.W.2d 628, 632, 155 A. L. R. 1413; 69 C. J. 91, section 1147. The presumption against intestacy is particularly strong where the subject of the gift is a residuary estate. 28 R. C. L. 227, 228, section 189. A residuary bequest is designed to dispose of that not otherwise disposed of. In re Estate of Hartman, 233 Iowa 405, 410, 9 N.W.2d 359, 363." See also Gunn v. Wagner, 242 Iowa 1001, 1012, 48 N.W.2d 292.

Defendants assert that Clara by her will showed her intent that the grandsons should have this farm. An important factor in determining one's intent is the knowledge that person had of the true situation and of the actual facts relative to the matter. The record clearly shows that she believed the grandsons were given this land by their grandfather Porter's will. Whether a remainder was vested or contingent has been an issue in count-

less suits. It is a reasonable assumption that she had no knowledge of such matters. For more than ten years after she received the quitclaim deed the record discloses no indication that she did not believe she was the owner of this land.

The earliest indication on her part, as shown by the record, that she thought she had only the life estate devised to her in the will of her father, was in her own will executed March 18, 1943. How she arrived at this mistaken conclusion does not appear. It was because of this erroneous assumption that she stated as she did in the fifth paragraph of her will and the first codicil.

 She gave her grandsons nothing by her will. All of the residue and remainder of her property and estate were "devised and bequeathed to her daughter, Nellie," and included the land involved in this suit, regardless of whether she realized it or not. She died seized of this land and it passed under the residuary clause of her will to her daughter.

To say that she would have devised this land to her grandsons had she known it was hers, would be but a conjecture and an immaterial one. There are persuasive evidence and inferences that she would not have done so. The mother and the children were not in Iowa after 1932. They lived in California. Grandma McKinley did not know their addresses. There was no communication between them for over ten years. She said that someone had poisoned their minds against her. Letters between them in the later years of her life do not indicate a friendly relationship.

She had been bountifully generous to her son James and his family. In 1918 she advanced him $300 to take his wife to the Mayo Clinic at Rochester, Minnesota. His note of that year for that amount was found in her bank box. She advanced $1200 toward defendant James L. McKinley's college education. He never repaid any of it. His note for $250 given in 1926 payable in two years was also found in her bank box. Clara's itemized statement of these debts aggregating about $17,000 was only a partial record. Other debts she had forgotten or had no record of them. No payment was ever made on these debts, if, as defendants contend, the quitclaim deed conveyed her nothing.

Notwithstanding Clara V. McKinley may have been unsure and uncertain of her ownership of this land, she did in fact own

it at her death and it passed under her will to Nellie McKinley Moore, the plaintiff. Knowledge by her that she owned it was not essential to its testamentary disposal to her residuary legatee.

In Ingham's Estate, 315 Pa. 293, 297, 172 A. 662, 663, 664, 93 A. L. R. 510, 513, the court said: "* * * the will contains a residuary clause, thus clearly evidencing the intention of the testatrix to dispose of the entire balance of her estate. Such a clause must be construed as passing all that the testatrix possessed, whether she was aware that she owned it or not. Indeed, one purpose of a general residuary clause is to dispose of such things as may have been forgotten or overlooked, or may be unknown. Ireland v. Foust, 56 N. C. 498. A similar argument to that made on appellant's behalf—that since she did not know she owned this property, she could not have intended to pass it by her will—was put forward in Smith v. Dugan, 145 App. Div. 877, 130 N. Y. S. 649, 652, affirmed per curiam 205 N. Y. 556, 98 N.E. 1116."

In Ledbetter v. Ledbetter, 188 Tenn. 44, 48, 216 S.W.2d 718, 720, it is stated: "Under a broad general devise 'of property of every kind' all property of the testator would pass even though the testator had no knowledge of the ownership of it. Ingham's Estate, 315 Pa. 293, 172 A. 662, 93 A. L. R. 510; Verchot's Estate, 4 Wash.2d 574, 104 P.2d 490."

In In re Estate of Verchot, supra, 4 Wash.2d 574, 583, 104 P.2d 490, 494, the court said: "The test of power of disposition by a residuary clause is whether the property belonged to the testator, *and not whether the testator knew that the property was his*. The legal effect of such a clause is to cover everything capable of being passed by will which is not otherwise well disposed of, and includes such property as the testator may have forgotten or overlooked, *or to which he may not have known that he had title*." (Italics ours.)

The fifth paragraph of Clara's will does not purport to devise this land to the grandsons, and expressly states "so in any and all events I will them no part of my estate."

In Fowler v. Lowe, 241 Iowa 1093, 1100, 42 N.W.2d 516, 520, the grantee in a deed given to her by her deceased husband, misconceived its significance, and as administratrix of her hus-

band's estate she inventoried the property conveyed to her as property of the estate. We said: "There is no merit in the argument advanced that Anna Sullivan did not 'consider' the deed a valid deed or that she 'abandoned' the real estate and the deed. * * * There is no necessity of pursuing the argument based upon what Anna Sullivan considered as to the validity of the deed or her alleged abandonment. After the deed was executed and delivered to her she received the title and her actions with respect to her husband's estate could not divest her of that title."

It is our conclusion that Nellie McKinley Moore took absolute title to and ownership of the 142 acres by her mother's will.

It is our judgment that the decree of the district court must be and is affirmed in all its parts, with respect to the original plaintiff-appellee, and also to the appellees substituted in her place and stead in this court, and the district court is directed to make its judgment and decree so conform herewith.—Affirmed.

All JUSTICES concur.